# UNITED STATES DISTRICT COURT
for the
**EASTERN DISTRICT OF WISCONSIN**

*In the Matter of the Search of*

Case Number: **11- M-275**

**1238 South 16th Street, Milwaukee, Wisconsin, more particularly described as: a tan single story building located in the rear of the building, with the front of the building occupied by a bakery with a green, white, and red awning over the bakery door entrance. The front door is a dark brown bordered door with a large glass center that advertises La Clinica Latina on the front. The door is located to the north of the awning. Entry to 1238 is gained by the use of the front door from the sidewalk. The building is located on the east side of South 16th Street, between the intersections of West Greenfield Avenue and West Scott Street.**

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, Ian House, a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI) under Immigration and Customs Enforcement (ICE), request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**1238 South 16th Street, Milwaukee, Wisconsin, more particularly described as: a tan single story building located in the rear of the building, with the front of the building occupied by a bakery with a green, white, and red awning over the bakery door entrance. The front door is a dark brown bordered door with a large glass center that advertises La Clinica Latina on the front. The door is located to the north of the awning. Entry to 1238 is gained by the use of the front door from the sidewalk. The building is located on the east side of South 16th Street, between the intersections of West Greenfield Avenue and West Scott Street, and**

located in the Eastern District of Wisconsin there is now concealed: **Please see Attachment A - list of items to be seized.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is which is (check one or more):

✓ evidence of a crime;
✓ contraband, fruits of a crime, or other items illegally possessed;
✓ property designed for use, intended for use, or used in committing a crime;
❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Title 18, United States Code, Sections 1015, 1425 and 1546.

The application is based on these facts:

✓ Continued on the attached sheet, which is incorporated by reference.
❑ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature
Name and Title: Special Agent Ian House
U.S. Department of Homeland Security

Sworn to before me, and signed in my presence.

Date August 23, 2011

City and state: Milwaukee, Wisconsin

_____
Judge's signature
THE HONORABLE PATRICIA J. GORENCE
United States Magistrate Judge
Name & Title of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Ian House, Special Agent, United States Department of Homeland Security, Homeland Security Investigations, being duly sworn and under oath state the following:

### Experience of Affiant

1. I am a Special Agent with United States Homeland Security Investigations (HSI) under Immigration and Customs Enforcement (ICE), comprised of the former United States Immigration and Naturalization Service (INS) and United States Customs Service. I have been employed by HSI since August 2008. I am currently assigned to the HSI Resident Agent in Charge (RAC), Office of Investigations, in Milwaukee, Wisconsin.

2. Prior to my current assignment, I was a United State Customs and Border Protection (CBP) Officer at the Pembina, ND, Port of Entry. I was employed by CBP for more than three years, from May 2005 to August 2008. While working as a CBP Officer, I was tasked with training new officers in the proper procedures relating to identifying and enforcing the Immigration and Customs laws of the United States, as well as other federal laws at the international border.

3. I have received training in fraudulent document detection from ICE/HSI. In February 2010 I was certified as a fraudulent document detection trainer.

4. In my current employment, I am assigned to investigate alleged violations of the Immigration and Nationality Act (INA). This includes the enforcement of laws prohibiting the unlawful production, possession, use, or distribution of falsified naturalization documents.

1

Case 2:11-mj-00275-PJG    Filed 09/01/11    Page 2 of 26    Document 1

<u>Purpose of Affidavit</u>

5.  I am investigating the activities of a person or persons who own, occupy and/or are employed at the premises located at 1238 South 16th Street (aka Cesar Chavez Blvd), Milwaukee, in the State and Eastern District of Wisconsin. Based upon the evidence developed to this point, there is probable cause to believe that the premises located at 1238 South 16th Street, Milwaukee, WI is being used to manufacture and distribute false naturalization documents.

6.  The investigation began on November 12, 2010, when the Citizenship and Immigration Services (CIS) informed HSI that a psychologist by the name of Dr. Milton Silva may be falsifying form N-648 at the cost of $600.00 USD per form. Silva's signature and medical license number appeared on each form submitted to CIS, along with a copy of a fraudulent psychology report and intelligence test results. Silva's signature is located in the attestation portion of the form, where the medical practitioner certifies the examination of the applicant and confirms the information provided on the N-648 is true and accurate under penalty of perjury.

7.  This affidavit is based not only on my own training, experience, and investigation, but also on information provided by other law enforcement officers with HSI, CIS, the Milwaukee Police Department (MPD), and the Wisconsin Department of Justice, Division of Criminal Investigation (DCI).

8.  As this Affidavit is offered for the limited purpose of establishing probable cause, I have not incorporated into this Affidavit every fact known to me as a result of this investigation.

2

Premises

9. The subject premises, known as 1238 South 16th Street, Milwaukee, Wisconsin, are more particularly described as: a tan single story building located in the rear of the building, with the front of the building occupied by a bakery with a Green, white and Red awning over the bakery door entrance. The front door is a dark brown bordered door with a large glass center that advertises La Clinica Latina on the front. The door is located to the north of the awning. The building is located on the east side of South 16th Street, between the intersections of West Greenfield Ave and West Scott St. Entry to 1238 is gained by the use of the front door from the sidewalk.

Statutes

10. This investigation concerns alleged criminal violations of Title 18, United States Code, Sections 1015, 1425 and 1546.

11. Title 18 United States Code, Section 1015 makes it unlawful to make any false statement under oath, in any case, proceeding, or matter relating to, or under or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens.

12. Title 18, United States Code, Section 1425(a) makes it unlawful to knowingly procure or attempt to procure, contrary to law, the naturalization of any person, or documentary or other evidence of naturalization or of citizenship.

13. Title 18, United States Code, Section 1546(a) makes it unlawful to knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or

3

regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact.

## Definitions

14. Lawful Permanent Resident (LPR) -- a foreign born person who holds citizenship to another nation, but has completed the necessary applications, petitions, and examinations to legally reside and work in the United States. LPRs are issued I-551 resident alien cards, allowing them to legally enter and be present in the United States.

15. Naturalized United States Citizen -- a United States Citizen (USC) who originally was born in a foreign country, but decided to immigrate to the United States and has completed the necessary applications, petitions, and examinations to take the oath of allegiance and become an USC.

16. N-400 Application For Naturalization -- form completed and submitted in order to take the oath to become a USC. The applicant must complete a series of interviews with a CIS interviewer to determine that the applicant is eligible for naturalization.

17. N-648 Medical Certification for Disability Exceptions -- form completed and certified by a medical doctor, licensed doctor of osteopathy, or licensed psychologist that the applicant has some sort of physical or mental disability, rendering the applicant unable to pass required interviews and tests. The medical practitioner must examine the applicant to determine if they qualify for this waiver. The medical practitioner must certify by signature under penalty of

4

perjury that the information on each form and attachments (if necessary) is true and correct.

18. Wechsler Adult Intelligence Scale (WAIS) -- an intelligence test consisting of 11 subtests that has been revised and updated in 1981, 1997, and 2008.

<u>Wechsler Adult Intelligence Scale</u>

19. The Wechsler Adult Intelligence Scale (WAIS) was created in 1955 as a revision of an older test created by Dr. David Wechsler. The WAIS was considered a primary clinical test used to measure the intelligence quotient (IQ) of adolescents and adults.

20. In 1981, the WAIS-Revised (WAIS-R) was released. The WAIS-R replaced the outdated WAIS. The WAIS-R was standardized by testing 1,800 people ranging in age from 16-74 years with six verbal and five performance tests. The six verbal test scores consist of the following:

> a.) Information: general knowledge questions;
>
> b.) Digit span: sets of numbers to repeat forwards and backwards;
>
> c.) Vocabulary: define some previously selected words;
>
> d.) Arithmetic: arithmetic problems in a paragraph format;
>
> e.) Comprehension: questions relating to social awareness; and
>
> f.) Similarities: questions relating to concept formation and asking to determine how two dissimilar items could be similar.

21. The five performance tests consist of the following:

> a.) Picture Completion: sets of small pictures that all have some detail missing;

5

b.) Picture Arrangement: sets of small pictures to be placed in a logical order;

c.) Block Design: place sets of blocks together to match patterns;

d.) Digit Symbol: copying a coded pattern; and

e.) Object Assembly: completing small jigsaw type puzzles.

22. The six verbal test scores are combined to obtain a Verbal IQ score. The five performance test scores are combined to obtain a Performance IQ score. These two scores are combined to obtain a Full Scale IQ.

23. In 1997, the WAIS-III (version 3) revision was released, hereby replacing the WAIS-R as the generally accepted test by the psychology community.

24. In 2008, the WAIS-IV (version 4) revision was released for use in the psychology community. The WAIS-IV is the current intelligence test used. All other WAIS tests are considered outdated.

### Information Received from CIS

25. I have met with CIS Officers Thomas Moore, John Pruhs, and Kari Exarhos-Marker, who interviewed applicants who submitted N-648s along with their N-400s. They explained to me that they've seen an unusually large number of applicants diagnosed by Silva as mildly mentally retarded with a non-specific learning disorder. Silva certified on each N-648, and an attached psychologist report, that each applicant had grown up in a rural environment, received very limited schooling, and had problems with memory. In addition, Silva reported that the applicants were either currently employed at entry and/or basic level positions, or were currently unemployed. Silva reported that each applicant never

6

learned English because they lived in primarily Spanish-speaking areas and spoke Spanish at their places of employment. Each applicant also allegedly had trouble writing, with difficulty even signing their name.

26. CIS researched what is defined as mental retardation, and discovered that according to the American Association on Intellectual and Developmental Disabilities, mental retardation is normally diagnosed during childhood. The process of determining mental retardation has three aspects: an IQ below 70-75; diagnosis prior to the age of 18 years; and trouble functioning in two or more of the following areas: communication, self care, home living, social or interpersonal skills, employment, health, safety, ability in schoolwork, use of community resources, or self direction. Every applicant examined by Silva had previously reported on their application for lawful permanent resident status that they suffered no mental defect or mental retardation. A majority of the applicants were not previous patients of Silva's, and only met with him to obtain the N-648 submitted with their application for naturalization.

27. I have reviewed the N-648s and attached psychologist's reports that were completed by Silva and filed with CIS for 21 applicants for naturalization. The 21 applicants are identified in Attachment A. In each case, the N648 forms were completed in ink by hand. The accompanying reports, however, were type written presumably by computer word processing. The reports each contain a heading which reads either "Dr. Milton N. Silva, Clinica Latina, 1239 South 16th Street, Milwaukee, Wisconsin 53204" or "Associated Clinical Professionals, 1238 South 16th Street, Milwaukee, Wisconsin 53204." The handwritten response on

7

each N648 form uses the 1238 South 16th Street address. Aside from the specific biographical information that is unique to each applicant, the test scores and IQ results fell into one of two scoring patterns: Verbal IQ score of 61, Performance IQ score of 62, and Full Scale IQ score of 58; or Verbal IQ score of 74, Performance IQ score of 60, and Full Scale IQ score of 63. Each of these results signifies the test taker is mentally performing at a level designated as mildly mentally retarded.

## Interviews

28. On January 14, 2011, I interviewed L.S., a 46 year old naturalization applicant from El Salvador who was seen by Silva and submitted an N-648 with the following WAIS-R scores: Verbal IQ score of 61, Performance IQ score of 62, and Full Scale IQ score of 58. L.S. was interviewed at his residence in Milwaukee. L.S. began to speak in the English language, with no apparent problems speaking to me or understanding the questions. L.S. stated he was born in El Salvador and couldn't read or write in Spanish or English. As the interview progressed, L.S. claimed to not understand the questions being asked about his appointment with Silva and requested to be interviewed in Spanish. A Spanish translator was contacted via cellular phone to assist in the interview.

29. L.S., through the translator, stated that while at church one day, he was speaking to his sister about his desire to become a naturalized USC. A gentleman who overheard L.S. and his sister speaking mentioned a doctor willing to provide a diagnosis to help with Immigration if you have a problem. The unknown gentleman stated that the doctor is good and will find a problem and diagnose it.

8

L.S. decided to contact this doctor, who he called "Dr. Milton", and paid him $500-$600 USD for four visits. L.S. stated "Dr. Milton" spoke to L.S. for a long time about becoming a USC. "Dr. Milton" showed L.S. pictures in a book and asked him to read out of a book. L.S. stated he couldn't read and had no knowledge of arithmetic. L.S. stated that "Dr. Milton" diagnosed him as having a learning disability and memory problems due to his illiteracy and forgetfulness. L.S. claimed that he paid "Dr. Milton" the $500-$600 USD in cash so that the medical visit wouldn't be submitted to his insurance company, because he didn't want them informing his regular medical doctor about his illiteracy.

30. I also went to Arandell Corporation, the company that employs L.S. I spoke to the Vice President of Human Resources and one of the human resources representatives. They both indicated that L.S has worked at their company since 2000. Both indicated that they didn't speak Spanish and were able to communicate with L.S. in English without difficulty. In addition, they indicated that L.S. didn't state on his employment application suffering any type of mental disability.

31. Later on January 14, 2011, I interviewed J.S., a 48 year old naturalization applicant from El Salvador, who filed an N-648 signed by Silva and reporting the following WAIS-R test scores: Verbal IQ score of 61, Performance IQ score of 62, and Full Scale IQ score of 58. J.S. works at H.M. Graphics Inc, located in Milwaukee. I spoke to the human resources manager, who said J.S. has been working at the company since 1996 as a machine operator. The human resources manager stated that J.S. did not have any issues in filling out and completing

9

forms. The human resources manager stated that J.S did not have a firm grasp of the English language, but his supervisor did, so he would assist J.S. with translations. I had the opportunity to witness J.S. working a magazine and catalog binding machine without any difficulty or assistance from fellow co-workers. The human resources manager stated that J.S. was required to set up the equipment as a part of his duties.

32. I interviewed J.S. with the assistance of his supervisor who acted as a translator. J.S. stated he had no medical issues or restrictions. J.S. stated that he couldn't read or write in either the Spanish or English languages. The supervisor mentioned that he would go to the bank with J.S. and assist with translations. J.S. stated he originally heard about Silva at his daughter's doctor's office when she had an appointment. J.S. didn't mention any tests Silva conducted, but did mention he paid $600.00 USD to the clinic for his appointment with Silva.

33. Later on January 14, 2011, I interviewed L.S.M., a 60 year old naturalization applicant from Mexico, through the use of a Spanish translator via cellular phone. The interview took place at L.S.M.'s residence in Milwaukee. L.S.M. was shown copies of his N-400 and an N-648, signed by Silva and reporting the following WAIS-R test scores: Verbal IQ score of 74, Performance IQ score of 60, and Full Scale IQ score of 63. He stated he was aware of both forms, and stated he looked for a doctor that spoke Spanish to discover why he couldn't remember anything taught to him during his English language classes. L.S.M. claimed to forget things, so he was unable to remember any English.

10

34. L.S.M. stated he had one appointment at the clinic on South 16th Street. L.S.M stated that the doctor had him write his name and cut paper. The doctor also gave him information to study to see what was retained. L.S.M stated that no vocabulary or arithmetic questions were asked of him.

35. At the end of the examination, the doctor informed L.S.M that he has a mental disability. L.S.M informed me that he was unsure what this meant.

36. On January 20, 2011, I interviewed A. H., a 59 year old naturalization applicant from Mexico, at her residence in Milwaukee. She submitted an N-648 signed by Silva reporting the following WAIS-R scores: Verbal IQ score of 74, Performance IQ score of 60, and Full Scale IQ score of 63. A.H. spoke no English and a Spanish translator was contacted via cellular phone for the interview.

37. A.H. identified her signature at the bottom of her N-400. She recalled meeting a doctor at La Clinica Latina, but couldn't recall what his name was. A.H. went to La Clinica Latina because she believes it is a good clinic that helps people. A.H. recalls the doctor did ask her many questions, but she doesn't recall what was asked. A.H. did recall that she wasn't asked any arithmetic problems or vocabulary questions, or to arrange pictures, build shapes with blocks, or complete puzzles, contrary to the psychologist report attached to the N-648 and signed by Silva. I asked A.H. if she was examined by a medical practitioner at the time she applied for her lawful permanent residence status, to which she said yes. I showed her the submitted medical exam accompanying her lawful permanent residence application, and directed her attention to the area that asks about mental disabilities. There is no marked box next to any of the areas relating

to mental disability or mental retardation. I asked her why there was no mention of a mental disability, A.H. did not respond.

38. On January 24, 2011, I interviewed Dr. James Hoelzle, an undergraduate and graduate professor of psychology at Marquette University. Dr. Hoelzle was referred to me as a subject matter expert on the WAIS test. Dr. Hoelzle first informed me that the WAIS-R test Silva indicated he was administering to the applicants was outdated. The current WAIS is the WAIS IV (version 4) test that was released in 2008.

39. Dr. Hoelzle also stated that the probability of two people, let along several people, obtaining the exact same Full Scale IQ test scores is highly unlikely unless the two people resided in the same area as children and had all the same background and educational levels. Even then the probability would be unlikely that two people would obtain the same subtest scores, Verbal and Performance IQ scores, and Full Scale IQ score.

40. Dr. Hoelzle did mention that someone tested from outside the United States may have difficulties achieving an accurate score due to the fact that some areas of the test are culture based. For example, Australia has a version of the WAIS that is based on Australian culture. Someone who isn't from Australia may not receive an accurate score and may receive results similar to someone who is mentally diminished or may have a learning disorder, even though they may have a normal IQ.

41. Dr. Hoelzle stated that in order to accurately diagnose a patient with a learning disorder, the examining doctor must test the patient with the WAIS test and

12

conduct academic achievement testing. Dr. Hoelzle stated that examining a patient only with the WAIS test wouldn't qualify someone with a learning disorder or as mentally retarded. The additional tests are necessary to an accurate diagnosis.

42. I also mentioned to Dr. Hoelzle that Silva appeared not to be administering the complete WAIS tests to the applicants. Dr. Hoelzle objected, stating that Silva would be unable to accurately score the test for the applicants.

43. On January 25, 2011, I interviewed M.R.A, a 50 year old naturalization applicant from the Dominican Republic who submitted an N-648 signed by Silva with the following WAIS-R test scores: Verbal IQ score of 61, Performance IQ score of 62, and Full Scale IQ score of 58. M.R.A stated that she has seen Silva for two years. She was unable to recall any testing procedures Silva administered for her N-648. M.R.A. stated she attempted to learn the English language, but kept forgetting what she had learned, and she wasn't able to read or write very well in the Spanish language either.

44. On March 22, 2011, I interviewed J.H.T, a 66 year old naturalization applicant from Mexico. J.H.T. submitted an N-648 signed by Silva and reporting the following WAIS-R scores: Verbal IQ score of 74, Performance IQ score of 60, and Full Scale IQ score of 63. J.H.T., through the use of a Spanish translator via cellular phone, stated his daughter scheduled his appointment with Silva and drove him to LA Clinica Latina. J.H.T. stated his signature appeared on the bottom of the N-400 form, but his daughter completed the form on his behalf. A photo of Silva and a photo of another doctor known to be working at La Clinic

13

Latina were shown to J.H.T. He identified the picture of Silva as the doctor with whom he had the appointment.

45. I asked J.H.T. if Silva requested him to complete any math or vocabulary problems, arrange any puzzles, or complete any pictures, to which J.H.T. stated he wasn't asked to complete any of these. This contradicts the report and forms signed and sworn by Silva that he completed every part of the WAIS test.

46. J.H.T. also stated that he was aware that his daughter paid money to the clinic, but was unsure as to the amount.

<u>Appointments with Dr. Silva and Purchase of Falsified Forms</u>

47. On May 9, 2011, a confidential source of information, hereinafter referred to as SA-50-MK, under the control of RAC Milwaukee, placed a consensually monitored phone call to La Clinica Latina, located at 1238 South 16th Street (aka Cesar Chavez Boulevard), Milwaukee, WI, the medical office where Silva works. SA-50-MK spoke to the receptionist in the Spanish language and scheduled an appointment for May 20, 2011, to see Silva.

48. On May 20, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva. SA-50-MK consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was conducted in the Spanish language, so a Spanish speaking special agent from DCI monitored the transmission.

49. SA-50-MK informed Silva that s/he was having problems remembering the American History due to becoming anxious during the naturalization test. SA-50-MK stated he was informed by a friend that Silva could assist him/her in giving

14

him/her paperwork to bypass the test. Silva admitted that he did help the friend's family, but stated that he normally assisted older people with the paperwork, not someone of SA-50-MK's age. Silva guided SA-50-MK through a number of breathing and relaxation techniques during the appointment. At the completion of the appointment, Silva requested that SA-50-MK return the following week for a follow up exam.

50. On May 27, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva. SA-50-MK again consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was conducted in the Spanish language, so a Spanish speaking MPD officer monitored the transmission.

51. SA-50-MK met with Silva and informed Silva s/he had someone attempt to administer a practice exam to him/her with the same poor results. Silva requested that SA-50-MK bring the naturalization test questions to their next appointment the following week. Silva promised SA-50-MK that the test "won't be a problem" for him/her. SA-50-MK then departed La Clinica Latina.

52. On June 3, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva for a third appointment. SA-50-MK again consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was conducted in the Spanish language, so a Spanish speaking MPD officer monitored the transmission.

15

53. Silva again guided SA-50-MK through a series of breathing and relaxation techniques, similar to their first appointment. At the conclusion of the appointment, SA-50-MK again brought up the topic of the N-648. Silva stated they would discuss it at their next appointment.

54. On June 17, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva for a fourth appointment. SA-50-MK again consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was conducted in the Spanish language, so a Spanish speaking special agent from DCI monitored the transmission.

55. SA-50-MK initiated the appointment speaking about the N-648. Silva again brought up SA-50-MK's age compared to the older persons Silva has provided N-648s for in the past. Silva left SA-50-MK in the waiting room for approximately 30 minutes. When they met again in the exam room, Silva gave SA-50-MK a letter signed by Silva and addressed to CIS, requesting that CIS not administer the examination to SA-50-MK due to short term memory problems and anxiety. The heading on the letter reads "Dr. Milton N. Silva, 1238 South 16th Street, Milwaukee, Wisconsin 53204." Silva charged SA-50-MK $150.00 USD for the letter. SA-50-MK paid Silva the $150.00 in pre-recorded money in the examination room. Silva informed SA-50-MK that if the letter didn't exempt SA-50-MK from the exam, to return with $600.00 USD and he would provide SA-50-MK with the necessary forms. The letter was subsequently secured as evidence.

16

56. On July 8, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva for a fifth appointment. SA-50-MK again consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was conducted in the Spanish language, so a Spanish speaking MPD officer monitored the transmission.

57. SA-50-MK met with Silva and produced paperwork provided by CIS. The paperwork indicated that SA-50-MK met for an interview and failed the exam because CIS did not accept the letter purchased from Silva on June 17, 2011. Silva read over the paperwork and subsequently made a copy of it at a copier out of the exam room.

58. Silva coached SA-50-MK how to answer the questions, telling SA-50-MK to answer the questions with short answers and not to provide any additional information. Silva informed SA-50-MK that s/he would have to prove that s/he had memory problems in order for the N-648 to be accepted.

59. Silva asked SA-50-MK questions relating to his/her background. Silva stated the form would be ready the following week, and that SA-50-MK could pay at delivery.

60. On July 15, 2011, SA-50-MK, under the control of RAC Milwaukee, entered La Clinica Latina, located at 1238 South 16th Street, to meet with Silva for a sixth appointment. SA-50-MK again consented to having audio and video equipment in his/her possession during the appointment. The entire appointment was

17

conducted in the Spanish language, so a Spanish-speaking special agent from DCI monitored the transmission.

61. SA-50-MK met with Silva, and received an N-648, handwritten, signed by Silva, and dated July 8, 2011. Silva signed the form under penalty of perjury, certifying that all the information provided on the form is true and correct. SA-50-MK paid Silva $600.00 USD in pre-recorded money in the exam room. The form was subsequently secured and is being held as evidence.

<u>Purchased N-648 From Silva</u>

62. The N-648 Medical Waiver of Disability Exemption that was purchased on July 15, 2011 is known to be fictitious in nature, based in part on the following:

> (a). Silva stated on the N-648 that he examined SA-50-MK with a memory test, however, according to the monitored surveillance transmission, no exam was conducted during any appointments.
>
> (b). The N-648 contained information not previously discussed in prior appointments, i.e. SA-50-MK's special education classes; SA-50-MK's hereditary memory problems; and SA-50-MK being a patient of Dr. Leonardo Aponte, another physician at La Clinica Latina. SA-50-MK has never met with Dr. Aponte.

<u>Seizure of Computer Evidence</u>

63. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and

18

mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

    (a). Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

    (b). Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or

Case 2:11-mj-00275-PJG    Filed 09/01/11    Page 20 of 26    Document 1

password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

(c). The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.

(d). Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free

20

space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.

(e). Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable

21

from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

(f). Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

22

## Conclusion

64. Based on the above information, I believe probable cause exits to search the subject premises located at 1238 South 16th Street, Milwaukee, in the State and Eastern District of Wisconsin. There is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. Sections 1015, 1425(a) and 1546, as listed in Attachment A, which is incorporated herein by reference, are located on the subject premises.

65. I respectfully request that the attached warrant be issued authorizing the search of the subject premises and the seizure of the items listed in Attachment A.

IAN HOUSE
Special Agent
U.S. Homeland Security Investigations

23

**Attachment A**
**Property to be Seized**

Any and all documents referenced below, whether found on paper or stored digitally on computers, computer hardware, memory storage devices, flash drives, scanners, printers, floppy diskettes, computer software, computer related documentation, manuals, passwords, printouts, peripherals, and other such materials:

1. N-648 forms, N-400 forms, and any other immigration or naturalization forms, and/or copies thereof, that may have been sold to other individuals;

2. Permanent resident cards, social security cards, and any other personal identification documents and/or copies thereof;

3. Document or money ledgers, customer lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the quantity of documents produced, transferred or possessed, and identifying document-making implements obtained or used for the purpose of producing or transferring fraudulent documents;

4. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents, and other items or lists reflecting names, addresses, telephone numbers, and communications regarding illegal activities among and between persons involved in the fraudulent document activities;

5. United States currency and other financial instruments traceable to the production, storage, or distribution of personal identification documents; and

6. Documents establishing residency of the premises.

7. Medical records, billing statements, account information, doctor's notes, tests and test results for the following individuals:

   (a) Marigza Ruiz De Acosta
   (b) Julia Perez Vda. De Solis
   (c) Silvia Guzman-Gallegos
   (d) Maria Chombo De Lopez
   (e) Maria Gomez
   (f) Manuel Valdivia-Sanchez
   (g) Enrique Hernandez Trejo
   (h) Antonia Hernandez
   (i) Alicia Cruz
   (j) Luis Sanchez-Martin
   (k) Jose Serrano
   (l) Luis Serrano

24

(m) Rafela Vega
(n) Antonio Perez-Perez
(o) Jose Hernandez Trejo
(p) Olga Hernandez
(q) Maria Ducan
(r) Juan Carlos Plascencia-Plascencia
(s) Fidelina Navarro De Sosa
(t) Victoriano Modesto-Buso
(u) Pedro Sanchez.

Case 2:11-mj-00275-PJG     Filed 09/01/11     Page 26 of 26     Document 1